UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TORRELL SAXON,

                     Petitioner,

   - against -

UNITED STATES OF AMERICA,

                     Respondent.

---

**OPINION AND ORDER**

12 Cr. 320 (ER)
13 Civ. 4966 (ER)
14 Civ. 733 (ER)

Ramos, D.J.:

       Torrell Saxon ("Petitioner") brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (the "Petition"). Petitioner asserts that he was denied his Sixth Amendment right to counsel because his lawyer provided ineffective assistance during plea negotiations with the Government, which culminated in the sentence that Petitioner now challenges. For the reasons stated below, the Petition is DENIED.

## I. BACKGROUND

       Petitioner was arrested on March 25, 2012 at a residence in Middletown, New York after the owner of the residence called 911 and reported that Petitioner had entered the residence with a gun in an attempt to rob the four inhabitants. In the process, Petitioner shot at one of the inhabitants. The police officers who arrived found a gun at the scene and arrested Petitioner. Petitioner was transferred to federal custody and indicted on April 23, 2012 on one count of being a felon-in-possession of a firearm under 18 U.S.C. § 922(g)(1). (12-cr-320, Doc. 4).

       The Indictment also charged that Petitioner was subject to an enhanced mandatory minimum sentence of fifteen years under the Armed Career Criminal Act ("ACCA") because he had previously been convicted of three or more violent felonies or serious drug offenses. *See* 18

U.S.C. § 924(e).  Specifically, in 2000, Petitioner had been convicted of two robberies in the first degree, and in 1996, he had been convicted of criminal sale of a controlled substance in the third degree, a Class B felony under New York law.

Petitioner was appointed an attorney from the Federal Defenders of New York ("trial counsel"), and subsequently pleaded not guilty at his arraignment.  Trial counsel did not contest the Government's contention that Petitioner's three prior convictions were sufficient predicates for enhancement of his sentence under the ACCA.  Thus, trial counsel never challenged the enhancement, and instead settled on a strategy with the primary goal of avoiding the fifteen-year minimum sentence mandated by the ACCA.  Specifically, the defense adopted a strategy of admitting certain criminal conduct but denying that Petitioner had a gun on the night of his arrest (the "Innocence Proffer"), in the hopes that the Government would drop the ACCA charge.  In the Innocence Proffer, Petitioner admitted to the Government that he went to the residence to sell oxycodone, but insisted it was *he* who was robbed at gunpoint by the inhabitants, and further insisted that he did not possess a gun on the night of his arrest.

Among other challenges, Petitioner now asserts that trial counsel was ineffective because her entire strategy was premised on the incorrect assumption that Petitioner's three prior felonies qualified as ACCA predicates, a proposition she never bothered to research or contest.  Instead, invoking recent case law from the United States Supreme Court and two decisions in this District, Petitioner argues that New York's recent adoption and retroactive application of a more lenient sentencing regime for drug offenses means that his 1996 drug conviction no longer qualifies as a predicate "serious drug offense" under the ACCA.  § 924(e)(2)(A).  According to Petitioner, therefore, because trial counsel failed to research the issue of whether the ACCA

enhancement applied, she provided ineffective assistance causing Petitioner to agree to plead guilty to a charge that subjected him to a higher sentence than he otherwise would have faced.

Trial counsel's strategy was at least successful on its own terms.  On December 21, 2012, the parties negotiated and entered into a plea agreement (the "Plea Agreement") under which the Government dismissed the felon-in-possession charge in exchange for Petitioner's guilty plea to a two-count Superseding Information:  one count of distribution and possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C), and one count of distribution and possession with intent to distribute alprazolam and clonazepam, in violation of 21 U.S.C. § 841(b)(1)(E)(2).[1]  *See* Government's Memorandum of Law in Opposition to Petitioner's Supplemental Motion To Vacate, Set Aside or Correct His Sentence Pursuant to 28 U.S.C. § 2255 ("Gov't Opp'n") (13-cv-4966, Doc. 62), Ex. D ("Plea Agreement") at 1–2.  The new charges did not include an ACCA enhancement, which requires a conviction on a firearms violation, and hence contained no mandatory-minimum sentence.  The Plea Agreement stipulated that, based on Petitioner's status as a career offender, Petitioner faced a Sentencing Guidelines range of 151 to 188 months' imprisonment (the "Stipulated Range") and a statutory maximum sentence of twenty years.  *Id.* at 2–4.  The Plea Agreement also stipulated that the Government could not charge Petitioner with possession of a firearm, but could attempt to establish such possession solely for the purposes of securing a two-level enhancement of Petitioner's offense level at a hearing pursuant to *United States v. Fatico*.  *Id.* at 3.[2]  The Plea

---

[1] The oxycodone charge was based on the admissions Petitioner provided at the Innocence Proffer.  The alprazolam and clonazepam charge was based on a then-pending state court case against Petitioner, of which the Government was aware.  Gov't Opp'n at 2.

[2] The two-level gun enhancement would not actually affect Petitioner's offense level, as his status as a career offender required that the offense level be 32, which was higher than the offense level calculated for the two counts of the Superseding Information (either 16 or 18, depending on whether the gun enhancement applied).  *See* Plea Agreement at 3; U.S.S.G. § 4B1.1(b)(3).

Agreement also provided that the Petitioner could not appeal, nor collaterally challenge any sentence within or below the Stipulated Guidelines Range of 151 to 188 months' imprisonment. *Id.* at 5.[3]

Petitioner pleaded guilty on December 21, 2012.  Gov't Opp'n, Ex. E ("Plea Tr.").  After the Probation Office issued its Presentence Report recommending the same sentencing range that the parties had agreed upon in the Plea Agreement, Petitioner informed trial counsel that he wanted to withdraw his guilty plea because it left open the possibility that his sentence could be enhanced by possession of the gun, despite his strenuous insistence that he did not possess the gun on the night in question.  At a conference before this Court on April 9, 2013, however, trial counsel informed the Court that she had advised Petitioner not to withdraw his plea, and Petitioner then confirmed that he had indeed changed his mind and was rescinding his request to withdraw.  *See* Gov't Opp'n, Ex. F.

The Court held a *Fatico* hearing[4] on April 17 and April 23, 2013 with respect to Petitioner's possession of the gun.  Gov't Opp'n, Exs. G, H ("Fatico Tr.").  Testifying for the Government was (1) Juan Moreira Adular, one of the inhabitants of the residence, who described the encounter with Petitioner, testified that Petitioner shot at him, and described how he and the other inhabitants ultimately restrained Petitioner until the police arrived, and (2) an ATF firearms and tool mark examiner, who testified that the tool mark evidence corroborated Juan Moreira Adular's version of events on the night in question.  The Government also played the 911 call from the residence on the night in question.  Testifying for Petitioner was (1) a criminalistics

---

[3] The United States Court of Appeals for the Second Circuit dismissed Petitioner's appeal of his conviction, terms of imprisonment and supervised release, and special assessment on July 7, 2016.  (12-cr-320, Doc. 54).

[4] "A '*Fatico*' hearing is a sentencing hearing at which the prosecution and the defense may introduce evidence relating to the appropriate sentence."  *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979)) (internal quotations omitted).

expert, (2) the officer who responded to the 911 call, (3) the officer who conducted the crime scene investigation, and (4) Petitioner himself, who again claimed that he had been robbed by the inhabitants of the residence, and that he had not possessed or discharged a firearm.  Petitioner also submitted two statements from Rodrigo Perez-Suarez, another inhabitant of the residence present on that night.  The first was the police statement given by Perez-Suarez on the night of the arrest, the second was given by Perez-Suarez to an agent five-and-a-half months after the arrest, and both statements actually corroborated the Government's theory that Petitioner possessed and discharged a firearm at the residence, and described the altercation during which Perez-Suarez and the other inhabitants managed to physically restrain Petitioner.  *See* Fatico Tr. at 142–45.[5]

On May 30, 2013, the Court concluded that the Government had proven by a preponderance of the evidence at the *Fatico* hearing that Petitioner possessed and discharged a firearm on the night in question.  Gov't Opp'n, Ex. I ("Sentencing Tr."), at 2–6.  The Court found that the Government's theory that Petitioner had possessed and discharged a firearm was corroborated by Moreira's testimony, the ATF expert's testimony, the two statements from Perez-Suarez, the 911 call, and other forensic evidence presented by the Government.  Sentencing Tr. at 4.  On the other hand, the Court found that Petitioner's theory that he was actually a victim of robbery was supported only by his own testimony, which was contradicted by other record evidence and not particularly credible given Petitioner's admission that he was drunk at the time of the incident and did not remember much of the night in question prior to reviewing discovery produced in the case.  *Id.* at 4–5.  The Court also found that Petitioner's

---

[5] Trial counsel submitted these statements to show inconsistencies between Perez-Suarez's account and the account given by Moreira during his live testimony.  *See* Fatico Tr. at 260.

expert witness agreed with the Government's ATF expert regarding the bullet strikes in the residence, both of which were consistent with the Government's recitation of the facts.  *Id.* at 6.

Based on the finding that Petitioner possessed and discharged a firearm, the Court determined that Petitioner's Sentencing Guidelines range was 151 to 188 months' imprisonment. The Court nonetheless imposed a below-Guidelines sentence of 120 months' imprisonment.  *Id.* at 8, 22.  After sentencing Petitioner, the Court stated its belief that Petitioner had "put in…all the evidence that [he] had" and "received a full hearing on whether or not there was a gun in that apartment, who had the gun in the apartment," and "who fired the gun."  *Id.* at 30–31. Nonetheless, the Court found Petitioner's theory of events "inherently preposterous" and "absolutely implausible."  *Id.*

Petitioner filed his initial § 2255 petition *pro se*, claiming ineffective assistance of counsel on July 16, 2013, and followed up with an amended petition on July 31, 2013 and a supplemental petition on August 22, 2013.  (13-cv-4966, Docs. 1, 3, 6).  Petitioner then filed a separate § 2255 petition *pro se*, covering substantially similar grounds on January 27, 2014 and followed with an amended petition on March 21, 2014.  (14-cv-733, Docs. 1, 9).  On September 3, 2015, Petitioner, now represented by counsel, filed a supplemental brief that, for the first time, raised the argument that the ACCA should not have applied to the felon-in-possession charge included in the original Indictment.  (13-cv-4966, Doc. 54).[6]  On February 9, 2016, the Court held oral argument.  *See* Transcript ("Oral Tr.") (13-cv-4966, Doc. 70).

---

[6] Although Petitioner did not raise his ACCA argument on direct appeal to the Second Circuit, "the Supreme Court has determined that 'failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255'" in the district court. *Williams v. United States*, No. 14 Civ. 0829 (KMW), 2015 WL 710222, at *2 (S.D.N.Y. Feb. 19, 2015) (quoting *Massaro v. United States*, 538 U.S. 500, 505–06 (2003)).  "In fact, § 2255 is the preferred method for bringing a claim of ineffective assistance of counsel because a district court's assessment of a § 2255 claim provides 'the forum best suited to developing the facts necessary to determining the adequacy of representation.'" *Id.* (quoting *Massaro*, 538 U.S. at 505).

## II. DISCUSSION

### A.  Legal Standard

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty…."  *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (citations omitted). To succeed on a claim of ineffective assistance of counsel, a claimant must satisfy the two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984):

> Under *Strickland*, in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must meet a two-pronged test:  (1) he 'must show that counsel's performance was deficient,' so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance,' and (2) he must show 'that the deficient performance prejudiced the defense,' in the sense that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"

*Bennett v. United States*, 663 F.3d 71, 84 (2d Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 690, 694); *see also Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (applying *Strickland* to pleas).

### B.  Petitioner's Ineffective-Assistance Claim Based on Trial Counsel's Failure To Challenge the ACCA Enhancement

#### 1.  *Strickland* Prong One:  Ineffective Performance

Under the first prong of *Strickland*, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  The Court "must make 'every effort…to eliminate the distorting effects of hindsight,' and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'"  *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) (quoting

*Strickland*, 466 U.S. at 689).  The convicted defendant is required to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and the Court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

Petitioner's main contention is that trial counsel was constitutionally ineffective because she failed to challenge the assertion that Petitioner was ACCA-eligible.  The failure was critical here because the mandatory-minimum sentence required by the ACCA was the primary driver of trial counsel's strategy of avoiding the felon-in-possession charge by providing the Innocence Proffer.  *See* Petitioner's Supplemental Brief (13-cv-4966, Doc. 54) ("Pet'r Br.") at 8–9 ("[E]ven though trial counsel identified ACCA as the key factor driving Mr. Saxon's sentencing exposure, she did nothing to assess the Government's position that the 15-year statutory minimum actually applied to Mr. Saxon.").

Notably, the Government concedes that trial counsel "assumed that ACCA applied, and never considered the ACCA claim [Petitioner] now advances."  Gov't Opp'n at 19.  Indeed, the Government does not even attempt to refute the bulk of Petitioner's evidence on the first prong of *Strickland*.  Trial counsel's affidavit clearly lays out her belief that the ACCA-imposed mandatory minimum applied to her client and provided the impetus for adopting the "unusual" and "aggressive" strategy of pursuing the Innocence Proffer.  *See* Affirmation of Attorney (13-cv-4966, Doc. 55, Ex. A) ("Att'y Aff.") ¶¶ 2–6, 14.  The Government does not challenge Petitioner's contention that neither trial counsel's case file nor recordings of the phone calls between Petitioner and trial counsel "contain any indication that [trial counsel] performed research on whether [Petitioner] was eligible for enhanced sentencing under the [ACCA]."

Declaration of M. Brent Byars (13-cv-4966, Doc. 55) ("Byars Decl.") ¶¶ 3–4.  And the Government essentially concedes that there was nothing strategic about trial counsel's unwavering assumption that the ACCA enhancement applied.  *See* Gov't Opp'n at 24 n.14 (stating that trial counsel did not consider "alternative" sentencing scenarios, but rather "always assumed…that ACCA applied").[7]

Rather than defend trial counsel's actual performance, the Government's primary position is that she merely failed to research a *meritless* legal argument.  The Government argues that "the ACCA claim would have been rejected by this Court," and thus "trial counsel's failure to make that claim was not ineffective assistance."  Gov't Opp'n at 19.

(a) The Intersection of ACCA and New York's Drug Law Reform Act

When a felon is both convicted for possessing a firearm under federal law and "has three previous convictions…for a violent felony or a serious drug offense, or both, committed on occasions different from one other," the ACCA imposes a fifteen-year mandatory minimum.  18 U.S.C. §§ 922(g), 924(e)(1).  As relevant here, a "serious drug offense" includes "an offense under State law...*for which a maximum term of imprisonment of ten years or more is prescribed by law*."  § 924(e)(2)(A)(ii) (emphasis added).  Under the Supreme Court's holding in *McNeill v. United States*, whether a prior conviction qualifies as a predicate "serious drug offense" is determined by looking to the maximum term of imprisonment under state law *at the time of the conviction*.  563 U.S. 816, 825 (2011).  The *McNeill* Court explicitly stated in a footnote, however, that it was not addressing "a situation in which a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense."  *Id.* at 825 n.1 ("We do not address

---

[7] The Government repeated these concessions at oral argument.  Oral Tr. at 35–36.  The Government also agreed that "a huge part" of trial counsel's strategy was to avoid the mandatory minimum under ACCA.  *Id.* at 38.

whether or under what circumstances a federal court could consider the effect of that state action.").[8]

There is no dispute that at the time of Petitioner's drug conviction in 1996 his offense was a Class B felony under New York law for which the maximum term of imprisonment was twenty-five years. *See* Pet'r Br. at 9. A straightforward application of *McNeill* would thus dictate that Petitioner's conviction constituted a "serious drug offense" for ACCA purposes because the maximum term of imprisonment was more than ten years in 1996. But in 2009, as part of a broader series of reforms of the Rockefeller Drug Laws, New York State enacted the Drug Law Reform Act of 2009 ("2009 DLRA"), which "reduced penalties for drug-related offenses by allowing resentencing for felons convicted of class B felony drug offenses." *Rivera v. United States*, 716 F.3d 685, 688 (2d Cir. 2013) (citing 2009 N.Y. Laws ch. 56, pt. AAA, § 9 (codified at N.Y. Crim. Proc. L. ("CPL") § 440.46)). Specifically, the 2009 DLRA reduced the maximum term of imprisonment for first-time Class B drug felonies to *nine* years; thus, Class B felonies no longer qualify as "serious drug offenses" for ACCA purposes. In addition, the 2009 DLRA provided retroactive relief by allowing already-sentenced Class B drug felons to "apply to be resentenced" so long as certain criteria of eligibility were met. *See* CPL § 440.46(1).[9]

---

[8] The Court's footnote appeared to respond to the Solicitor General's brief in *McNeill*, which stated as follows: "[I]f a State subsequently lowered the maximum penalty and made that reduction available to defendants previously sentenced as of the same date as the defendant now at issue, *the defendant could plausibly look to that reduced maximum as stating the law applicable to his previous conviction.* For example, if such a defendant had taken advantage of state sentence-modification proceedings to lower his sentence in accordance with a reduced maximum, *cf.* 18 U.S.C. § 3582(c), that reduced maximum could apply to his conviction for ACCA purposes." Br. for the United States, *McNeill v. United States*, 563 U.S. 816 (2011) (No. 10-5258), 2011 WL 1294503, at *18 n.5 (emphasis added). The state law at issue in *McNeill* reduced the maximum sentence for certain offenses to four years, but did not make available retroactive resentencing relief. *Id.*; *see also McNeill*, 563 U.S. at 818.

[9] Reduced sentences for already-sentenced defendants are not automatic. Applications for resentencing are made pursuant to CPL § 440.46. "In order to *apply* for resentencing under CPL 440.46(1), a person must: (1) be in the custody of [the Department of Corrections and Community Supervision]; (2) have been convicted of a class B felony offense defined in article 220 of the Penal Law; (3) have committed the offense prior to January 13, 2005; (4) be serving an indeterminate sentence with the maximum term of more than three years; and (5) not be serving a sentence on a conviction for or have a predicate felony conviction for an exclusion offense," which the provision

However, one element of these eligibility criteria requires that the defendant seeking resentencing still be incarcerated or on parole for the conviction—which Petitioner is not—and thus he is not technically eligible for resentencing under the 2009 DLRA regime.  *See id.*; *People v. Brown*, 32 N.E.3d 935, 936–37 (N.Y. 2015).

        In addition to that technical disqualification, the parties vigorously dispute whether the 2009 DLRA falls within the ambit of the *McNeill* footnote—*i.e.*, whether the statutory maximum penalty now applicable to Petitioner's offense is nine years rather than twenty-five years, due to the availability of retroactive resentencing relief.  Petitioner argues that for ACCA purposes, regardless of whether Petitioner individually qualifies under New York's eligibility regime, because New York has now determined that his offense is *not* a serious drug offense, and because New York has made available retroactive relief, his conviction may no longer serve as an ACCA predicate.  Accordingly, trial counsel's failure to move for dismissal of the ACCA enhancement in the original Indictment constituted ineffective assistance.  But the Government maintains that the Petitioner's 1996 offense remains an ACCA predicate because (i) Petitioner is not eligible for resentencing, (ii) did not apply for resentencing, and (3) would have been denied relief if he had applied.  Therefore, despite trial counsel's failure to research the issue, "it is black-letter law that failure to make a meritless claim cannot constitute ineffective assistance of counsel."  Gov't Opp'n at 19 (citations omitted).

---

defines as a violent felony offense or another offense ineligible for merit time allowance.  *People v. Overton*, 86 A.D.3d 4, 13 (N.Y. App. Div. 2011); *see also* CPL § 440.46(5) (defining "exclusion offense").  The 2009 DLRA further instructs that the state court to which an application is made "shall" issue a resentencing order "unless substantial justice dictates that the application should be denied."  2004 N.Y. Laws ch. 738, § 23 (resentencing provision incorporated by CPL § 440.46(3)).  New York courts interpret this provision as creating a statutory presumption in favor of resentencing.  *See, e.g.*, *People v. Gonzalez*, 96 A.D.3d 875, 876 (N.Y. App. Div. 2012).  "[I]n determining whether substantial justice dictates the denial of a resentencing application," New York courts "consider the totality of the circumstances, including the nature and seriousness of the offense for which the defendant was sentenced, the defendant's conduct post-sentence, and his or her criminal and institutional record."  *People v. Ford*, 103 A.D.3d 492, 492 (N.Y. App. Div. 2013) (citations omitted).

To date, two courts in this district have considered this precise issue and rejected the Government's position, specifically holding that prior convictions for Class B drug felonies no longer constitute ACCA predicates because of the 2009 DLRA.  *See United States v. Calix*, No. 13 Cr. 582 (RPP), 2014 WL 2084098, at *11–15 (S.D.N.Y. May 13, 2014); *United States v. Jackson*, No. 13 Cr. 142 (PAC), 2013 WL 4744828, at *3–6 (S.D.N.Y. Sept. 4, 2013).[10]  No court in this district has adopted the Government's position.  As a preliminary matter, then, it is a stretch to call Petitioner's legal contention here "meritless."[11]

The Government's bottom-line is that the 2009 DLRA does not have any retroactive operation for ACCA purposes *unless and until* a particular defendant applies for and is resentenced.  The argument is that, because the 2009 DLRA does not automatically reduce sentences across-the-board but rather establishes terms of eligibility and allows judges the discretion to deny resentencing in particular cases, the statute operates retroactively to strip a prior Class B offense of its status as an ACCA predicate *only* where actual resentencing has occurred.  *See* Gov't Opp'n at 10.  Since Petitioner served his sentence well before enactment of the 2009 DLRA, he was not eligible to apply for retroactive relief under the statute, and thus, according to the Government, his 1996 Class B felony "still carries a maximum sentence of 25 years."  *See id.* at 9, 11–13.

---

[10] Both defendants in *Calix* and *Jackson*, like Petitioner here, were no longer serving their sentences and thus were technically ineligible for retroactive relief under the 2009 DLRA.  *See Calix*, 2014 WL 2084098, at *14; *Jackson*, 2013 WL 4744828, at *3 n.2.

[11] The Government's sole attempt at distinguishing *Jackson* and *Calix* is based on the proposition that those courts got it wrong because they were not adequately briefed on the full extent of discretion that the 2009 DLRA affords the resentencing court, particularly when it comes to fact-specific determinations of whether "substantial justice" dictates the denial of resentencing.  *See* Gov't Opp'n at 17–19.

The Government does not dispute that in those cases where offenders have applied for and received relief under the 2009 DLRA, the ACCA enhancement is not available.  The core question here is what other situations, if any, permit such a disposition.

By positing that the answer is "none" because of the 2009 DLRA's selective eligibility criteria, the Government in essence reads the *McNeill* footnote to contemplate only regimes of across-the-board retroactive relief that apply automatically to those offenders who have already completed their sentences.  But any real world resentencing regime has to accommodate pragmatic issues of administration, such as eschewing the meaningless effort of providing a resentencing process for people who are no longer incarcerated or will be out of prison by the time the application process is complete.  There are, in other words, various reasons why a resentencing regime would not automatically apply to every person ever convicted of a certain offense that are unrelated to a legislative reassessment about the categorical seriousness of that offense.  By requiring actual resentencing, the Government's position imposes too high a burden on states seeking to enact practical retroactive relief that also allows past offenders to avoid an ACCA enhancement for crimes that were previously punished too severely.

### (b) Application of the 2009 DLRA to Petitioner

In enacting ACCA, Congress deferred to the states to determine which offenses were sufficiently serious to qualify as predicates.  The "maximum term of imprisonment…prescribed" by state law serves as the ACCA's "measure of the seriousness of state offenses involving the manufacture, distribution, or possession of illegal drugs."  *United States v. Rodriquez*, 553 U.S. 377, 388 (2008) ("Congress presumably thought—not without reason—that if state lawmakers provide that a crime is punishable by 10 years' imprisonment, the lawmakers must regard the crime as 'serious,' and Congress chose to defer to the state lawmakers' judgment.").  The

*McNeill* footnote essentially suggests that the general rule requiring sentencing courts to look to the maximum sentence under state law at the time of conviction does not necessarily hold where retroactive relief is made available.  The implied reason is that retroactivity serves as the state's acknowledgement that the seriousness attached to the offense at the time of conviction *was wrong*.

All things considered, New York law embodies such a sentiment.  *Cf. United States v. Darden*, 539 F.3d 116, 128 (2d Cir. 2008) (concluding that the first wave of New York drug reform laws "reflects the state's current normative judgment about the seriousness of these offenses and this normative judgment plainly applies to past crimes as well as new crimes"), *abrogated by McNeill*, 563 U.S. at 819.[12]  For ACCA purposes, the 2009 DLRA's retroactive relief and ameliorative purpose is sufficient to justify a sentencing court to look to the current maximum term of imprisonment, rather than the maximum on the date of the conviction.  *Accord Calix*, 2014 WL 2084098, at *15; *Jackson*, 2013 WL 4744828, at *6.

The structure of the 2009 DLRA supports this interpretation.  Under the statute, a "defendant who is eligible for resentencing…enjoys 'a presumption in favor of granting a motion for resentencing relief absent a showing that substantial justice dictates the denial thereof.'" *People v. Gonzalez*, 96 A.D.3d 875, 876 (N.Y. App. Div. 2012) (quoting *People v. Beasley*, 47 A.D.3d 639, 641 (N.Y. App. Div. 2008)); *see also People v. Brown*, 115 A.D.3d 155, 161 (N.Y. App. Div. 2014) ("The Legislature clearly intended that lengthy sentences be replaced by shorter ones as a matter of course and that only in exceptional cases, in which the People can show that

---

[12] *Darden* first and foremost held that the ACCA requires sentencing courts to look to maximum sentences under state law at the time of sentencing, not at the time of the conviction.  *McNeill* expressly abrogated this holding in cases where states had not enacted retroactive sentencing provisions.  *McNeill*, 563 U.S. at 825.  Nonetheless, *Darden*'s discussion of the history and purpose of New York's drug reform laws remains instructive.  Moreover, the abrogation of *Darden* does not suggest that the 2009 DLRA fails to qualify for the exception in the *McNeill* footnote, because *Darden* dealt exclusively with pre-2009 New York drug laws, *i.e.*, before retroactive resentencing relief was made available to Class B offenders.  *See Jackson*, 2013 WL 4744828, at *6.

substantial justice dictates that a defendant not be resentenced, should he or she be deprived of

the ameliorative effect of the statute."), *aff'd*, 32 N.E.3d 935 (N.Y. 2015).  The fact that the

occasional overriding of that statutory presumption turns only on a defendant's individual

circumstances—most of which are unrelated to the seriousness of the original offense—

reinforces New York's view that Class B offenses are *categorically* less serious than they were

once thought to be.

  "This interpretation of the 2009 DLRA's retroactive application is also in line with the

statute's remedial purpose."  *Calix*, 2014 WL 2084098, at *14 (citing *People v. Sosa*, 963 N.E.2d

1235, 1239 (N.Y. 2012) (noting that the 2009 DLRA should be interpreted in a manner

"consistent with the legislation's necessarily broad remedial objectives in addressing the

sequelae of the prior sentencing regime and should not be effectively nullified as a matter of

statutory interpretation")).  "The purpose of the 2009 DLRA, like that of its predecessors, the

2004 and 2005 DLRAs…, was to grant relief from what the Legislature perceived as the

inordinately harsh punishment for low level non-violent drug offenders that the Rockefeller Drug

Laws required."  *People v. Paulin*, 952 N.E.2d 1028, 1031 (N.Y. 2011) (citations and internal

quotation marks omitted).  "The Court must be mindful of the ameliorative purposes of the 2009

DLRA's resentencing provisions," which "were obviously intended to bring the sentences of

appropriate eligible offenders sentenced prior to 2005 in line with the lower sentencing

parameters in existence for the same crimes today."  *People v. Figueroa*, 894 N.Y.S.2d 724, 745

(N.Y. Sup. Ct. 2010).  The 2009 DLRA retroactive provisions reflect "the consistent view

of…state lawmakers…that the Rockefeller [Drug Laws] were too severe, then as now."  *Jackson*,

2013 WL 4744828, at *6 (quoting *Darden*, 539 F.3d at 127) (internal quotation marks omitted);

*see also Calix*, 2014 WL 2084098, at *15.  It would undermine the legislative intent behind the

2009 DLRA to ignore its broad remedial goals and plow ahead with enforcing outdated

Rockefeller sentences in the ACCA context.  *Cf. Brown*, 32 N.E.3d at 938 ("[R]emedial statutes

such as the DLRA should be interpreted broadly to accomplish their goals—in this case the

reform of unduly harsh sentencing imposed under pre–2005 law."); *People v. Coleman*, 21

N.E.3d 200, 206 (N.Y. 2014) ("As we have made clear, when the legislature enacted the 2009

DLRA, it sought to ameliorate the excessive punishments meted out to low-level, nonviolent

drug offenders under the so-called Rockefeller Drug Laws, and *therefore the statute is designed*

*to spread relief as widely as possible, within the bounds of reason, to its intended beneficiaries*.")

(citations omitted) (emphasis added).

The Government relies heavily on the 2009 DLRA's statutory eligibility requirements.

But it has not offered any persuasive arguments that these requirements arise from the

legislature's view of the *seriousness* of Class B drug offenses, which is the critical issue for

ACCA purposes.  To the contrary, the eligibility requirements are plainly meant to alleviate

administrative burdens on the courts by making actual resentencing available to those actually in

need of it.  *See Calix*, 2014 WL 2084098, at *15 ("In providing resentencing to those Class B

felony drug offenders incarcerated at the time of the DLRA's passage, the legislature could not

have meant to treat those individuals who had already been released as more serious offenders.

More likely, 'the legislature recognized that the burden of inordinately harsh punishment falls

most heavily on those who are in prison.'") (quoting *Paulin*, 952 N.E.2d at 1031); *cf. Darden*,

539 F.3d at 126 (reasoning that 2004 DLRA and its legislative history "amply confirm that New

York does not view drug crimes committed before January 13, 2005, as 'more serious' than drug

crimes committed after that date," because the statute's non-retroactive nature "was almost

surely enacted to combat problems of retroactive administration").  There is no indication in the

statute or its legislative history that some defendants were made ineligible for resentencing *because* the state legislature viewed their Class B offenses as more serious than the offenses committed by eligible defendants. *Cf. Darden*, 539 F.3d at 126–27 (stating that "the purpose" of the non-retroactive 2004 DLRA "was to replace the harsh Rockefeller sentencing laws with more appropriate sentencing laws, not to recognize a new class of drug offenses that were less serious *because* they were committed after the statute's effective date").

Petitioner's circumstances here illustrate the point well.  Convicted in 1996 for a Class B offense, Petitioner was exposed to a possible maximum sentence of twenty-five years, but received the minimum sentence of one to three years.  Pet'r Br. at 9.  By the time of the 2009 DLRA's enactment, Petitioner was long released from custody, and thus could not apply for resentencing relief.  Under the Government's view, then, Petitioner's Class B offense would still serve as an ACCA predicate.  But a hypothetical defendant convicted of the identical offense on the same day as Petitioner, and who received the maximum twenty-five year sentence, would still be incarcerated when the 2009 DLRA came into effect and could thus apply for and receive resentencing relief.  It would be perverse, to say the least, to interpret the 2009 DLRA in a manner that saddles Petitioner with an ACCA predicate simply because his sentence was exceedingly shorter than the hypothetical defendant's sentence.  *See Jackson*, 2013 WL 4744828, at *5 ("The Government does not offer any plausible explanation for why New York's legislature intended to apply the 2009 DLRA's sentencing modifications retroactively to those who are still incarcerated, but to deprive those who have already been released from prison of its ameliorative effect.").[13]  This absurd result—pressed by the Government—is one that cuts to the

---

[13] Nor does interpreting the 2009 DLRA to benefit defendants technically ineligible for resentencing in the ACCA context overstep the *McNeill* footnote, which spoke only to state laws making retroactive reductions "available" to defendants, without reference to actual resentencing in-fact or to a requirement that every single defendant be eligible for reductions.  *See Jackson*, 2013 WL 4744828, at *4 ("Jackson is not applying to be resentenced for his

very heart of the 2009 DLRA's remedial purpose, and it makes no sense to adopt an interpretation that abides by it.[14]

The Government also emphasizes the *McNeill* Court's discussion of the absurd results that would have followed had that case come out the other way, *i.e.*, had the Court adopted a general rule that the sentencing court always refer to the current maximum prison sentence under state law rather than the maximum in effect at the time of the conviction.  First, the *McNeill* Court posited a scenario in which a state makes prospective changes between the conviction and the federal sentencing—such as changing maximum sentences or "reformulat[ing] the offense"—and thereby allows the possibility that two identically situated defendants, who committed the same offense on the same day, and had identical criminal histories, would

---

prior convictions and *McNeill* does not require that he be eligible for resentencing based upon the retroactive modification of the laws under which he was convicted.  Rather, to fit within the question left open by *McNeill,* the subsequent change in law must only be 'available to defendants previously convicted and sentenced.'  The 2009 DLRA allows for the retroactive modification of sentences for Class B felonies, even it does not do so for Jackson in particular.") (quoting *McNeill*, 563 U.S. at 825 n.1).

[14] At oral argument, the Government insisted that this result is required by state law and is thus unavoidable in the ACCA context, comparing it to the result in *Rivera v. United States*, 716 F.3d 685 (2d Cir. 2013).  In *Rivera*, the defendant's ACCA predicate was a Class C offense, for which the 2009 DLRA provides no specific retroactive relief.  The statute does, however, allow a Class B offender who was also sentenced for a Class C offense "at the same time" or "in the same order of commitment" to apply to reduce the sentence served for both offenses.  CPL § 440.46(2) (applying this rule for Class C, D, or E felonies).  Thus, as the Government frames it, state law codifies the absurd result in which a defendant who committed only a Class C offense could not receive resentencing but a defendant who committed both a Class B and Class C offense could receive resentencing, and the Second Circuit accepted this absurdity in *Rivera* by holding that the defendant's Class C offense remained an ACCA predicate.  *See Rivera*, 716 F.3d at 690.  The Court is not persuaded by this comparison.  The determinative fact in *Rivera* was that none of the drug reform laws purported to provide retroactive relief for Class C offenders specifically—which is to say, the New York Legislature never expressed an ameliorative purpose or made available a remedial scheme regarding Class C offenses.  *See id.* (holding that New York's sentencing scheme "mirrors those addressed in *McNeill*" because there are no retroactive provisions specifically applicable to Class C offenders).  In other words, there was never a legislative determination that Class C offenses were being punished too harshly.  The opposite is true for Class B offenses, and this distinction alone is fatal to the Government's comparison.  *See Jackson*, 2013 WL 4744828, at *4 (distinguishing *Rivera* along these lines).  The comparison to *Rivera* would be more apt if New York had actually determined that a certain category of Class C offenses were less serious than others and enshrined that determination in criteria for resentencing eligibility, but that is not the case—the provision allowing reduction of a sentence simultaneously imposed for both a Class B and a Class C offense is clearly not a legislative statement that Class C offenses committed alongside Class B offenses are less serious than Class C offenses standing alone.  It is more likely a simple acquiescence to the fact that people can be sentenced for multiple offenses at once, and that state judges need not be forced to parse out overlapping sentences in every case in which a Class B offender serving one sentence for multiple offenses applies for a sentence reduction.

"receive dramatically different federal sentences" under the ACCA solely because of the timing of the federal sentencing.  *McNeill*, 563 U.S. at 823.  Where a state has disavowed previous maximum sentences and made retroactive resentencing available, however, the underlying concern—"avoid[ing] disparate outcomes for similar situated defendants"—is just as well served by making ACCA's application "dependent on the *revised* state sentencing provisions for *both* defendants in the Supreme Court's hypothetical."  *Jackson*, 2013 WL 4744828, at *5 (emphasis added); *accord Calix*, 2014 WL 2084098, at *15 & n.10.  Similarly situated defendants are thus treated the same for ACCA purposes, in a manner that better reflects the state's remedial scheme and ameliorative purpose.[15]

    Finally, the Court rejects the Government's alternative argument that trial counsel's performance was not deficient because the ACCA argument was "novel."  Gov't Opp'n at 20. The Government claims that the *McNeill* footnote was only "pithy, cryptic dictum," of which Petitioner's hypothetical ACCA claim was not a "straightforward application."  *Id.*  But the *McNeil* footnote was not cryptic—it plainly suggested that availability of retroactive sentence reductions can create an exception to *McNeill*'s general rule that courts must look to the maximum sentence at the time of the conviction to determine whether an ACCA predicate lies. Furthermore, though *Jackson* and *Calix* had not been decided at the time trial counsel was

---

[15] The Government makes another absurdity attack on the interpretation adopted here—namely, that it would be absurd to say that a defendant's statutory maximum for ACCA purposes is nine years due to the 2009 DLRA, even though that defendant either (i) actually completed a longer sentence before the 2009 DLRA was enacted, or (ii) applied for resentencing under the 2009 DLRA but had the application denied and thus continued to serve a sentence longer than nine years.  *See McNeill*, 563 U.S. at 821 (finding it "hard to accept the proposition" that defendant's "maximum sentence" was thirty-eight months where he actually served a ten-year sentence) (quoting *Rodriquez*, 553 U.S. at 383).  This is an absurd result where the sentencing changes under state law are purely prospective, as they were in *McNeill*.  But it is meaningful that the *McNeill* Court explicitly refused to address retroactive state laws. When retroactivity is put in play, it inevitably creates the possibility that actual sentences end up longer than the retroactive maximum allows for—indeed, the Government's own position permits just this result in a case in which an inmate applies for and receives resentencing under the 2009 DLRA during, say, his twelfth year of imprisonment. In this context, a state's clear ameliorative intent should take precedence over what is primarily a rhetorical absurdity rather than a substantive one.

formulating her plea-bargaining strategy, *McNeill* had been, and Petitioner points to multiple of trial counsel's former colleagues at the Federal Defenders of New York who relied on the *McNeill* footnote to make the same argument Petitioner puts forth.  Pet'r Br. at 12 (citing briefs filed in November 2011 and September 2012, *see* Byars Decl., Exs. G, H).[16]  Finally, the four out-of-Circuit cases that the Government relies on do nothing more than indicate that courts sometimes deny ineffective-assistance claims for failure to raise novel but meritorious arguments; they do not establish that *this* ACCA argument was novel, especially because they involve more adventurous or counterintuitive legal arguments than what is at issue here.  *See* Petitioner's Reply Brief (13-cv-4966, Doc. 64) ("Pet'r Rep.") at 5 n.3 (distinguishing the Government's four cases).

In sum, trial counsel's apparent lack of research into the ACCA question, and her attendant failure to assert this meritorious argument, fell below an objective standard of reasonableness and thus constituted ineffective performance.  *See, e.g.*, *Cornell v. Kirkpatrick*, 665 F.3d 369, 382–83 (2d Cir. 2011) (finding "trial counsel's performance fell below an objective standard of reasonableness" where counsel, "for no strategic reason, did not raise a likely meritorious challenge to venue"); *Moore v. Bryant*, 348 F.3d 238, 242 (7th Cir. 2003) ("Where erroneous advice is provided regarding the sentence likely to be served if the defendant chooses to proceed to trial, and that erroneous advice stems from the failure to review the statute or caselaw that the attorney knew to be relevant, the attorney has failed to engage in the type of good-faith analysis of the relevant facts and applicable legal principles, and therefore the deficient performance prong is met."); *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 286 (S.D.N.Y.

---

[16] The defendant's brief in *Jackson*, in fact, was filed "less than a month after trial counsel dissuaded [Petitioner] from attempting to withdraw his plea," and two weeks *before* the Court sentenced Petitioner.  Pet'r Br. at 12 (citing Byars Decl., Ex. I).

2006) (finding "failure to research and brief" admissibility of certain documents "fell well below objective standards of reasonableness"); *Hernandez v. United States*, No. 92 Civ. 7232 (CSH), 1992 WL 331137, at *2 (S.D.N.Y. Oct. 30, 1992) ("The Court concludes that defense counsel's failure to research the applicable law and challenge the Assistant United States Attorney's construction of the law rises to the level of ineffective assistance of counsel…."). Petitioner has thus satisfied his burden on the first prong of the *Strickland* test.

### 2. *Strickland* **Prong Two: Prejudice**

"To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "[T]he defendant must show more than that the unprofessional performance merely had some conceivable effect [to] satisfy the 'reasonable probability' test[;] however, a defendant *need not show* that counsel's deficient conduct *more* likely than not altered the outcome in the case." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (alteration in original) (citations and internal quotation marks omitted).

"In the plea bargain context, the petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances, or that there is a reasonable probability that he could have negotiated a [more favorable] plea…or that he would have litigated an available defense." *Whyte v. United States*, No. 08 Cr. 1330 (VEC), 2015 WL 4660904, at *5 (S.D.N.Y. Aug. 6, 2015) (citations and internal quotation marks omitted); *see also Missouri v. Frye*, 132 S.Ct. 1399, 1409 (2012) ("To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have

been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.");
*Dorfmann v. United States*, 597 F. App'x 6, 8 (2d Cir. 2015) (requiring proof that petitioner "would have insisted on trial or been able to secure a better plea bargain").  Courts must also "keep in mind that 'a defendant has no right to be offered a plea, nor a federal right that the judge accept it.'"  *Kovacs*, 744 F.3d at 51 (quoting *Frye*, 132 S.Ct. at 1410).

Petitioner argues he was prejudiced because his sentencing exposure (both in terms of Guidelines range and statutory maximum) if he went to trial on the felon-in-possession charge that did not include the ACCA enhancement and lost (92–115 months and 10 years maximum) was *lower* than his exposure under the Plea Agreement his trial counsel convinced him to accept (151–188 months and 20 years maximum).  Pet'r Br. at 17.  But this argument relies on two questionable propositions—that the Government would not have sought to bring additional charges after losing the ACCA enhancement, and that Petitioner would have proceeded to trial regardless of what the Government did.  Neither has enough support in the record to establish the "reasonable probability" required here.  *Kovacs*, 744 F.3d at 51.

The Government convincingly argues that, after insisting on a bottom guidelines range of 151 months in exchange for dispensing with the fifteen-year mandatory minimum, Petitioner's successful dismissal of the ACCA enhancement would have similarly spurred the Government to at least maintain the 151-month Guidelines floor by superseding with additional charges of which it was aware.  *See* Gov't Opp'n at 22.  Petitioner's counsel conceded at oral argument that the Government would have superseded with the charge that became the second count in Petitioner's actual superseding indictment—distributing and possessing with intent to distribute alprazolam and clonazepam.[17]  Oral Tr. at 47.  The parties dispute whether the Government

---

[17] 21 U.S.C. §§ 841(a)(1), 841(b)(1)(E)(2).  The Government does not assert that it would have superseded with charges related to Petitioner's sale of Oxycodone on the night of the incident in question, presumably because this

would have further superseded with a charge for distributing and possessing with intent to distribute heroin, for which Petitioner was arrested on August 13, 2011 and charged in state court.  Gov't Opp'n at 22.[18]  Petitioner does not contest the existence or the heroin charge, but argues that the Court cannot conclude that the Government would have superseded with it because by the time of the guilty plea "the State had already dropped that charge and there is no evidence that the Government considered bringing the charge federally."  Pet'r Rep. at 10 n.6; *see also* Oral Tr. 46–47.  The Government in response points to (i) the fact that bringing the heroin charge would entail little additional costs and no downside, (ii) its insistence on a 151-month floor during actual plea negotiations, and (iii) the common federal practice of assuming dropped State charges where such charges would serve as a predicate for a career offender enhancement, all of which demonstrate that the Government would surely have sought to include the heroin charge.  *See* Oral Tr. at 41–43, 54–55.

The Court agrees with the Government.  The mere fact that the State had previously dropped the felony count and that the charge was not made part of the prior plea negotiations with Petitioner does not establish a reasonable probability that the Government would have unilaterally declined to include the charge—which carries a twenty-year statutory maximum sentence—while acquiescing to a ten-year statutory maximum.  *See Sinclair v. United States*, No. 10 Cr. 392 (CS), 2013 WL 3716898, at *5 (S.D.N.Y. July 16, 2013) (finding lack of prejudice based on plea deal stipulating drug weight, because government would not have

---

charge was only made possible by the Innocence Proffer, itself a product only of trial counsel's failure to research the ACCA-predicate issue.

[18] 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(C).  Petitioner was in possession of fifteen glassine envelops of heroin and arrested by police officers in the Bronx on August 13, 2011.  The parties agree that, while the state originally brought both a felony charge for possession with intent to distribute and a misdemeanor possession charge, the felony charge was dropped while the misdemeanor charge was still pending during plea negotiations in this case. Oral Tr. at 41, 48.

offered plea deal without weight stipulation and would have superseded with additional count in the event offer was rejected).

In addition to superseding with additional charges, the Government maintains that Petitioner would have faced substantial sentencing exposure from the non-ACCA felon-in-possession charge, because the "Cross Reference" section of U.S.S.G. § 2K2.1 would have potentially required a base offense level of 33 had the Court determined that the facts of the offense constituted attempted murder in the first degree.  Gov't Opp'n at 22–24.[19]  Petitioner retorts that the Government conceded the impossibility of establishing the specific intent necessary to prove attempted murder "because of the 'uncertainty as to why [he] was [in the apartment] and…that he was intoxicated.'"  Pet'r Rep. at 10 n.6 (quoting Gov't Opp'n at 23). The Court need not resolve the merits of these alternative scenarios, but given the Court's findings at the *Fatico* hearing, it is easy to conclude the Government would have at least been able to make colorable argument that the gun charge could result in a higher sentence even without the ACCA enhancement due to the attempted-murder cross-reference.  The availability of those positions supports the Government's contention that there is no reasonable probability that Petitioner would have ended up with a better plea deal or proceeded to trial.

Even assuming Petitioner successfully challenged the ACCA enhancement, then, it is highly likely he still would have faced charges putting him in "criminal history category VI, with an offense level of 32 or 33," creating guidelines exposure of either 210–262 months'

---

[19] In reaching this conclusion, the Government argues as follows:  (i) U.S.S.G. § 2K2.1(c)(1)(A) requires application of § 2X1.1 (Attempt, Solicitation, or Conspiracy), because Petitioner "used or possessed" a firearm "cited in the offense of conviction in connection with the commission or attempted commission of another offense," (ii) § 2X1.1 in turn provides that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section," and (iii) the facts of Petitioner's felon-possession conviction constitute attempted murder, and the attempted-murder guideline, § 2A2.1(a), provides a base offense level of 33 "if the object of the offense would have constituted first degree murder," and otherwise sets a base offense level of  27. *See* Gov't Opp'n at 22–23.

imprisonment or 235–293 months' imprisonment.  *See* Gov't Opp'n at 22–24.  In fact, it is

undisputed that the heroin charge *standing alone*, without any gun charge, would have triggered

a career offender enhancement and exposed Petitioner to a sentencing range of 151 to 188

months—the exact range that Petitioner originally accepted in his plea deal.  *See* Oral Tr. at 56–

57.  The Court thus agrees with the Government that there is no "evidence to show[] that

[Petitioner] would have rejected the deal he actually took, in which the bottom of the guidelines

range was 151 months' imprisonment."  Gov't Opp'n at 24.

   In sum, Petitioner's position requires the Court to accept that the Government would have

taken no additional action after losing the ACCA enhancement.  While the record demonstrates

that the Government was not insistent on imposing a fifteen-year mandatory minimum, it does

show that even the Government's plea offer still exacted a substantial sentence with a bottom-of-

the-guidelines range of 151 months.  It is highly implausible, given the options available to the

Government discussed above, that Petitioner would be in a position to secure a plea deal with a

lower range than that—particularly so in this case, where Petitioner actually discharged a gun in

the course of an armed robbery and qualified as a career offender, even if not under the ACCA.

It is equally implausible that Petitioner would have rejected the same exact deal and gone to trial

instead, just because he succeeded on his ACCA motion.   Petitioner's ineffective-assistance

claim therefore fails, because he has not established a reasonable probability that he would have

been offered a better plea deal than the one he actually received, or that he would have foregone

his plea deal and gone to trial instead.  *See Kovacs*, 744 F.3d at 52 ("'[B]ecause a defendant has

no right to be offered a plea,' the ultimate outcome of a plea negotiation depends on whether the

government is willing to agree to the plea the defendant is willing to enter.  To prevail on that

ground, a petitioner must therefore demonstrate a reasonable probability that the prosecution

would have accepted, and the court would have approved, [a better plea deal]….") (quoting *Frye*, 132 S.Ct. at 1410).

**C.  Petitioner's Remaining Claims Are Waived, Meritless, or Moot**

Petitioner's Plea Agreement contained a waiver of his right to bring a petition pursuant to 28 U.S.C. § 2255.  Gov't Opp'n, Ex. D. at 5; *see also Garcia–Santos v. United States*, 273 F.3d 506, 509 (2d Cir. 2001) (*per curiam*) (upholding validity of §2255 waiver in petitioner's plea agreement).  A petitioner can "rebut the presumption of enforceability" of a § 2255 waiver only by showing "that 'the waiver was not made knowingly, voluntarily, and competently,' that the sentence was 'imposed based on constitutionally impermissible factors,' that 'the government breached the plea agreement,' or that 'the sentencing court failed to enunciate any rationale for the defendant's sentence.'"  *United States v. Shi Hui Sun,* No. 09 Cr. 778 (KBF), 2013 WL 1947282, at *3 (S.D.N.Y. May 8, 2013) (quoting *United States v. Gomez–Perez*, 215 F.3d 315, 319 (2d Cir. 2000)).  Here, Petitioner brings a barrage of challenges about trial counsel's conduct and performance, which the Court construes as effectively arguing that Petitioner's § 2255 waiver was not knowing or voluntary because of trial counsel's ineffective assistance.  Petitioner also alleges that the Court's sentence was constitutionally impermissible under the Supreme Court's holding in *United States v. Alleyne*, 133 S. Ct. 2151 (2013).  He nowhere alleges that the Government breached the Plea Agreement, or that the Court failed to enunciate a rationale for its sentence.  For the foregoing reasons, Petitioner's claims fail.

**1.  Ineffective Assistance Claims**

"Claims of ineffective assistance of counsel can survive § 2255 waivers, *but only* when the claim relates to the negotiation and entry of a plea or sentencing agreement."  *United States v. Cano*, 494 F. Supp. 2d 243, 248 (S.D.N.Y. 2007) (emphasis added); *see also United States v.*

*Martinez*, No. 09 Cr. 1022 (KMK), 2014 WL 7146846, at *6 (S.D.N.Y. Dec. 12, 2014) ("[A]

claim of ineffective assistance that is unrelated to the plea bargaining process does not provide a

basis upon which to invalidate a waiver of the right to challenge the conviction by appeal or by a

Section 2255 proceeding.") (citation and internal quotation marks omitted); *Bossous v. United

States*, No. 11 Civ. 5303 (DLC), 2012 WL 4435312, at *3 (S.D.N.Y. Sept. 26, 2012) ("[A] claim

of ineffective assistance of counsel will survive a waiver if the claim relates to advice counsel

gave with regard to entering the plea or the process by which the defendant agreed to plead

guilty.") (citing *Parisi v. United States*, 529 F.3d 134, 138–39 (2d Cir. 2008)). "Regarding

claims of ineffective assistance of counsel during sentencing specifically, the Second Circuit has

held that '[i]f we were to allow a claim of ineffective assistance of counsel at sentencing as a

means of circumventing plain language in a waiver agreement, the waiver of appeal provision

would be rendered meaningless.'" *Cano*, 494 F. Supp. 2d at 249 (quoting *United States v.

Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998)); *see also, e.g.*, *Martinez*, 2014 WL 7146846, at *6;

*Sinclair*, 2013 WL 3716898, at *1–2.

(a) Post-Plea Agreement Conduct

Across the multiple filings he submitted, Petitioner raises a large number of overlapping

objections, both general and specific, to trial counsel's *post*-Plea-Agreement conduct. With

respect to trial counsel's performance at the *Fatico* hearing, Petitioner accuses trial counsel of:

- Contradicting her own client by making the statement, "I don't think Mr. Saxon's stories makes no sense" [sic] (13-cv-4966, Doc. 3, at 1–2);[20]

---

[20] Petitioner relies heavily and repeatedly on this statement throughout his various briefs. The Court's own reading of the statement in context is that trial counsel was responding to the Government's contention that Petitioner's story did not make sense. She was expressing her belief, in other words, that Petitioner's story *did* make sense, and connecting that fact to what she saw as the Government's failure to meet its burden of proof. *See* Fatico Tr. at 264:7–12 ("[B]etween the inconsistencies with the witnesses' stories, with the fact that, frankly, I don't think Mr. Saxon's stories makes no sense, and I do think there is a reason for them to call 911, and the burden is on them to prove that he had the gun."). Indeed, immediately following this statement, trial counsel proceeded to outline all the ways in which she thought the Government's case fell short. *Id.* at 264–65.

- Speculating on her own theory of the events of March 25, 2012, including speculation that there may have been two guns and it was possible Petitioner had one of those guns, but that the Government never proved any of those theories (*id.* at 2, 4);

- Introducing a prior statement from the Government's own witness that put the gun in Petitioner's hands, which the Court used to corroborate the Government's theory (*id.* at 2–4);

- Informing the Government of her "defense techniques," saying that she "applaud[ed]" the cooperation of the Government, and making various "we" statements in reference to joint communications among trial counsel and the Government, all of which showed trial counsel's "loyalty" to the Government (*id.* at 2–3, 5–6; 14-cv-733, Doc. 9, at 7–8)

- Failing to fight in favor of Petitioner's version of the events of the night in question, including Petitioner's contention that there was a look out man in a yellow shirt that was involved with the other people Petitioner claims robbed him on that night (13-cv-4966, Doc. 3, at 5);

- Failing to "flesh out" or investigate Petitioner's theory that he saw a lookout man in a yellow shirt in the night in question who participated in robbing and them framing Petitioner (13-cv-4966, Doc. 6, at 5);

- Making Petitioner clarify on the stand that his selling of prescription drugs was illegal (*id.* at 4);

- Bringing up one of Petitioner's former robbery convictions (*id.* at 8);

- Implicating Petitioner in a conspiracy by stating, "I think he would like you to believe that they were selling his pills, but obviously I have no proof of that" (14-cv-733, Doc. 9, at 9);

- Introducing expert witness who corroborated Government's expert witness on bullet marks located in residence (*id.* at 10–11);

- Failing to interview and present the only witness who Petitioner believes could have corroborated his own telling of events from that night (*id.* at 11);

- Failing to object to various forms of prosecutorial misconduct during the hearing, including the prosecutor's improper reference to Petitioner's post-arrest silence during closing argument, the prosecutor's witness vouching, the prosecutor's speculation about facts of night in question, and the prosecutor's reference to hearsay from third parties that was not submitted as evidence (*id.* at 11–14);

- Failing to object to testimony from the Government's key witness admitting that the witness lies on occasions to protect his family (*id.* at 13–14); and

- Objecting to Petitioner's statement during his cross-examination that one of the Government's testifying witnesses was a liar (*id.* at 12).

In addition to his trial counsel's conduct during the *Fatico* hearing, Petitioner also claims ineffective assistance based on trial counsel's failure to object to certain technical and substantive errors in the PSR. (13-cv-4966, Doc. 6, at 7–8).

All of these ineffective-assistance challenges based on conduct subsequent to Petitioner's Plea Agreement are barred by the provision in the agreement waiving Petitioner's right to challenge his sentence pursuant to 28 U.S.C. § 2255. Based on Petitioner's clear statements at his plea allocution about both his understanding of the full Plea Agreement and his understanding of his waiver of appellate rights, Plea Tr. at 19–20, the record here amply demonstrates that Petitioner's § 2255 waiver was knowing and voluntary. *See Shi Hui Sun*, 2013 WL 1947282, at *3 ("[Petitioner's] statements at his plea allocution, in combination with the Plea Agreement itself, provide ample basis for the Court to find that his waiver of the right to challenge his sentence was knowing and voluntary."); *see also Garcia–Santos*, 273 F.3d at 508. Because the Court sentenced Petitioner below the stipulated sentencing guidelines, the knowing and voluntary waiver from the Plea Agreement was triggered. Thus, Petitioner's ineffective-assistance claims based on counsel's post-plea-agreement conduct during the *Fatico* hearing must fail, because they are "precisely the type of an ineffective assistance of counsel claim[s]" that the Second Circuit has barred based on a valid § 2255 waiver. *Cano*, 494 F. Supp. 2d at 249 ("[Petitioner's] claims of ineffective assistance of counsel in *proceedings subsequent to the consummation of the [Plea] Agreement* are barred by his appeal waiver because [the court] sentenced him within the stipulated guideline range.") (emphasis added). Furthermore, trial counsel's alleged failure not to object to errors in the PSR is also barred by Petitioner's § 2255 waiver. *See Bossous*, 2012 WL 4435312, at *3 (citing *Djelevic*, 161 F.3d at 107; *United States v.*

*Wilkes*, 20 F.3d 651, 653–54 (5th Cir. 1994) (holding that petitioner's ineffective-assistance claim based on counsel's failure to object to alleged inaccuracies in the PSR was barred by § 2255 waiver contained in plea agreement)).

Even if these claims were not barred by the § 2255 waiver, they would fail on the merits. Petitioner either misunderstands or misconstrues trial counsel's statements to make them seem more nefarious than they actually were in context, and thus fails to establish that any alleged error fell so far outside the range of objective reasonableness as to constitute ineffective assistance.  All of the statements from the *Fatico* hearing are either straightforward advocacy or strategic concessions made in place of overstating the strength of the evidence before the Court. Equally as fatal, Petitioner sets forth no argument for why any given error or combination of errors would change the Court's decision at the *Fatico* hearing or Petitioner's ultimate sentence. *See, e.g.*, *Hurel Guerrero v. United States*, 998 F. Supp. 211, 216 (E.D.N.Y. 1998) ("[A]ny claim petitioner might have had for ineffective assistance of counsel at the *Fatico* hearing fails because even the most competent of counsel could not have altered the facts that were disclosed at the hearing and the sentence that was ultimately imposed was the lowest that petitioner had bargained for under the plea agreement.  Thus, no matter how inadequate petitioner's representation was at the *Fatico* hearing, petitioner suffered no real prejudice."), *aff'd*, 186 F.3d 275 (2d Cir. 1999).  These ineffective-assistance claims thus fail on both prongs of *Strickland*.

(b) Pre-Plea Agreement Conduct

In addition to the ACCA claim discussed in detail above, Petitioner does include a small number of other allegations attacking trial counsel's *pre*-Plea-Agreement conduct, but these too are without merit.  Specifically, he alleges that trial counsel improperly made two promises prior to his guilty plea—first, that the gun would not be used to increase his sentence, and second, that

the Court would sentence him to significantly less than ten years.  (13-cv-4966, Doc. 1, at 8–10).

The record makes clear, however, that Petitioner was aware that the Government would try to

prove firearm-possession as a means of enhancing his sentence.  The Plea Agreement contained

an express carevout preserving the Government's right to attempt to enhance using the gun, and

at his plea allocution, Petitioner swore under oath that he "discuss[ed] every aspect" of the

agreement with trial counsel, that he fully understood the agreement, and that he was satisfied

with trial counsel's representation.  *See* Plea Tr. at 5, 18.[21]  Moreover, in her affidavit, trial

counsel confirms Petitioner's frustration with—but obvious knowledge of—the Government's

insistence on keeping open the possibility of proving firearm-possession.  *See* Att'y Aff. ¶¶ 10,

15.  In contrast, Petitioner fails to adduce any evidence showing that trial counsel falsely

promised that the Government would not try to enhance his sentence based on his possession of

the gun, or that Petitioner relied on such a false promise when agreeing to plead.  Similarly, with

regard to trial counsel's alleged promise about sentencing exposure, Petitioner also swore under

oath at his allocution that no one had made him any promises as to what his sentence would be.

Plea Tr. at 19.  This claim is thus also without merit.  *See, e.g.*, *Mejia* v. *United States*, 740 F.

Supp. 2d 426, 429 (S.D.N.Y. 2010) ("A defendant's bare allegations in a § 2255 petition cannot

overcome his contrary statements under oath during a plea allocution, which must be given

presumptive force of truth.") (citing *United States v. Hernandez*, 242 F.3d 110, 112–13 (2d Cir.

2001)).

---

[21] To the extent Petitioner is alleging that there was some separate promise outside the Plea Agreement that
foreclosed the Government's ability to enhance via firearm-possession, this challenge is also foreclosed by
Petitioner's swearing under oath that the Government made no promises to him outside the Plea Agreement itself.
*See* Plea Tr. at 19.

Petitioner also argues that trial counsel was ineffective prior to securing the Plea Agreement because she would communicate and share "everything" that Petitioner told her with the Government.  (13-cv-4966, Doc. 1, at 7).  Trial counsel states in her affidavit that the information that she "shared or discussed with the government was simply part and parcel of the necessary exchanges in our negotiations."  Att'y Aff. ¶ 8.  Again, absent any specific allegations or evidence to counter trial counsel's affidavit, Petitioner's bare allegation cannot sustain an ineffective-assistance claim.  This is particularly true with respect to his burden to identify an error that prejudiced the outcome of the plea negotiations, given that trial counsel's communications with the Government resulted in the very outcome that she and Petitioner strategized towards, *i.e.*, convincing the Government to drop the gun charge and accept a plea on the less-severe drug charges.

Next, Petitioner hints at allegations of prosecutorial and judicial misconduct by stating that trial counsel's "bad faith…help[ed] add to the judge who was bias" and "the prosecutor Micheal Gerber," who "usurp[ed] the discretion" of the Court and "maximize[d]" the defense's "downside," thus putting Petitioner in a "perfect position" to be convicted and sentenced.  (13-cv-4966, Doc. 1, at 3).[22]  Even construing this allegation liberally, the Court is unable to discern what improper conduct Petitioner is accusing this Court or the Government of partaking in.  Absent any more specificity in the allegations or any supporting evidence, this claim also fails.

---

[22] Petitioner's full allegation states as follows:  "[Trial counsel] acted in bad faith which help add to the judge who was bias and the prosecutor Michael Gerber who maximize in the process of usurpation of the discretion to put the defense downside on a perfect position to close the sentencing and the conviction of the defendant."  (13-cv-4966, Doc. 1, at 3).

Finally, and as Petitioner now acknowledges, his argument that trial counsel was ineffective for failing to file a timely notice of appeal is now moot because he has filed a timely *pro se* notice of appeal.  *See* Pet'r Br. 3 n.2.

All told, most of Petitioner's ineffective-assistance claims are barred by his knowing and voluntary § 2255 waiver, and those that survive the waiver nevertheless lack merit.[23]

### 2.  *Alleyne* Claim

Petitioner argues that the Court violated the Sixth Amendment under the Supreme Court's holding in *United States v. Alleyne*, 133 S. Ct. 2151 (2013), because rather than submit the fact-finding to a jury, the Court instead engaged in judicial fact-finding to conclude that Petitioner possessed and fired a gun on the night in question.  (14-cv-733, Doc. 9, at 3–7).[24]  The Court in *Alleyne*, however, explicitly stated that its decision did "not mean that any fact that influences judicial discretion must be found by a jury," and reaffirmed "that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment." *Alleyne*, 133 S.Ct. at 2163.  Hence, the *Alleyne* Court went out of its way to note that it was *not* overruling *Almendarez–Torres v. United States*, 523 U.S. 224, 241–42 (1998), which held that prior convictions enhancing a defendant's sentence are not "elements" of a crime that must be submitted to a jury.  *See id.* at 2160 n.1; *see also Hill v. United States*, No. 02 Cr. 728 (DRH),

---

[23] Prior to his bringing the ACCA claim, Petitioner also alleged that trial counsel was ineffective for advising him "in bad faith" to participate in an innocence proffer.  (13-cv-4966, Doc. 3, at 4).  To the extent this argument now sounds in trial counsel's failure to challenge the ACCA enhancement, the Court rests on its prior analysis.  But to the extent Petitioner maintains this advice was ineffective separate and apart from the faulty ACCA assumption underlying it, the Court rejects that argument.  Trial counsel's strategy, while aggressive, did not fall outside the bounds of reasonable professional judgment, demonstrated by the fact that trial counsel made sure to get sign off from her supervisor and colleagues at Federal Defenders.  *See* Att'y Aff. ¶ 6.

[24] To the extent Petitioner argues that trial counsel was ineffective for failing to research and make this legal argument under *Alleyne*, that claim fails because (i) it challenges post-plea-agreement performance and is thus waived by the valid § 2255 waiver, and (ii) trial counsel is not ineffective for failing to bring a meritless claim, which, as discussed above, the *Alleyne* claim is.

2015 WL 5821440, at *15 (E.D.N.Y. Oct. 5, 2015) ("In *Alleyne,* the Court held that any fact that increases mandatory minimum sentence for a crime is an 'element' of the crime, not a 'sentencing factor,' and must be submitted to a jury.  Here, the findings made by the Court at the *Fatico* hearing related to enhancements under the sentencing guidelines; the findings did not increase the mandatory minimum sentences."); *Beard v. United States*, No. 09 Cr. 12 (RLJ), 2013 WL 5874672, at *2 (E.D. Tenn. Oct. 30, 2013) (noting that *Alleyne* "left intact the rule in *Almendarez–Torres*…that a judicial finding of a prior conviction by a preponderance of evidence is entirely constitutional").  Petitioner's claim under *Alleyne* is thus without merit.

## III. CONCLUSION

For the foregoing reasons, the Petitions are DENIED.  The Clerk of the Court is respectfully directed (1) to close cases 13 Civ. 4966 and 14 Civ. 733, and (2) to terminate the motions, Docs. 29, 34, 35, 44 and 47 in Case No. 12 Cr. 320.

It is SO ORDERED.

Dated:     July 8, 2016
           New York, New York

                                        Edgardo Ramos, U.S.D.J.